**ROBERT N. AGRE, ESQUIRE**
**AGRE & ST. JOHN**
4 Kings Highway East
Haddonfield, NJ  08033
(856) 428-7797
attyagre@gmail.com
ATTORNEY FOR DEFENDANT, NICHOLAS BUCCIARELLI

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | UNITED STATES DISTRICT COURT |
|  | : | FOR THE DISTRICT OF NEW JERSEY |
|  | : | CAMDEN VICINAGE |
|  | : |  |
| v. | : | CRIM. NOS. 21-506 and 21-507 |
|  | : | (NLH) |
| NICHOLAS BUCCIARELLI, | : |  |
|  | : | BRIEF IN SUPPORT OF |
| Defendant. | : | NOTICE OF MOTION FOR |
|  | : | DISCLOSURE |

## STATEMENT OF FACTS

Defendant, Nicholas Bucciarelli, has been indicted in two (2) separate criminal actions with five (5) counts of Distribution of and Possession with Intent to Distribute Methamphetamine in violation of 21 U.S.C. 841(a)(1) and (b)(1)(B) (**Indictment 21-506-Exhibit A**) and with Violent Crime in Aid of Racketeering-Assault with a Dangerous Weapon in violation of 18 U.S.C. 1959(a)(3), Brandishing a Firearm During a Crime of Violence in violation of 18 U.S.C. 924(c)(1)(A)(ii) and Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. 922(g)(1) (**Indictment 21-507-Exhibit B**).

The CDS charges resulted after a series of controlled buys that were allegedly made with the assistance of a confidential human source (hereinafter "CHS") utilized by the Government in its

1

investigation of the Defendant. Specifically, the investigative reports related to the matter state that the CHS conducted the transactions with Defendant on June 14, 2019, June 17, 2019, July 2, 2019, July 24, 2019 and August 1, 2019. The July 24, 2019 transaction was allegedly conducted at Defendant's home in Brooklawn, New Jersey. On that date, it was reported that members of the FBI Task Force "observed CHS arrive at the rear of BUCCARIELLI'S residence [and]. . .Physical surveillance was maintained" by the law enforcement officers. **Exhibit C.**

Likewise, the assault and weapons offenses have been brought following an alleged incident on August 19, 2020 involving an undisclosed individual referred to as "an Associate of the Gloucester County Pagans ("Victim 1")" in Attachment B of the Criminal Complaint (hereinafter "the Complaint") filed against Defendant. **Exhibit D.** Paragraphs 13 through 15 of the Complaint allege that, on July 23, 2020, law enforcement observed an interaction between Victim 1 and Co-Defendant, Michael Dorazo at a parking lot in the Commonwealth of Pennsylvania. Exhibit D at Paras. 13-15. Paragraph 21 of the Complaint alleges that, on August 19, 2020, Defendant "entered the Gloucester Pagans Clubhouse carrying an axe handle". Exhibit D at Para. 21. Subsequent paragraphs of the Complaint assert that Mr. Buccarielli made threats with use of a weapon against Victim 1, struck him with the axe handle, left the clubhouse to retrieve Victim 1's cell phone

2

and then returned, interrogated Victim 1 and committed other acts in violation of the law. Exhibit D at Paras. 19-27.

The Government, despite the requests of the Defendant, has not disclosed the identity of either the CHS or Victim-1 in this matter. Nor has the Government disclosed the locations from which it conducted surveillance of the activities of either the CHS or Victim-1 insofar as their interactions with the Defendant. Yet, the Indictments filed against Defendant rely heavily upon the allegations of those unidentified individuals in conjunction with the alleged observations of law enforcement from undisclosed locations.

Although the Government has supplied audio recordings of the purported interactions on the alleged controlled buys, there is no video surveillance, and the informant is out of sight of the investigating officers. It is difficult, if not impossible, to ascertain what is occurring during the recorded time period and the CHS is the only witness available besides the Defendant to testify as to what occurred. Moreover, the Government has supplied no discovery with respect to the alleged incident on August 19, 2020 and the only information that Defendant possesses with regard to these charges is the hearsay allegations contained in the Criminal Complaint and Indictment. Significantly, the defense is also in possession of a witness interview which indicates that

"Victim 1" lied to the police with regard to the facts of the alleged incident.

Defendant, Nicholas Bucciarelli, thus seeks disclosure of both the informant identities and the surveillance locations in order to properly prepare his defense.

### LEGAL ARGUMENT

The disclosure of the identity of informants and the surveillance locations used by the United States in furtherance of prosecuting criminal matters is governed by Rovario v. United States, 353 U.S. 53 (1957) and progeny. As explained by the United States Supreme Court in Rovario, "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused or is essential to a fair determination of a cause, the privilege must give way. In these situations, the trial court may require disclosure and, if the Government withholds the information, dismiss the action." Id. at 60-61.

In Rovario, the Court developed the following balancing test to determine whether fundamental fairness compels disclosure of an informant's identity:

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration

4

> the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

Id. at 62. A court must examine the extent of the informant's participation in the criminal activity, the directness of the relationship between the defendant's asserted defense and the probable testimony of the informant, and the government's interest in non-disclosure. Id., see also, United States v. Gutierrez, 931 F.2d 1482, 1491 (11th Cir. 1991); United States v. Tenori-Angel, 756 F.2d 1505, 1509 (11th Cir. 1985).

The Rovario Court made clear that "[t]he scope of the privilege is limited by its underlying purpose." Id. at 60.

> A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.

Id. at 60-61. Put another way, if there is sufficient evidence apart from the informant's testimony, disclosure may not be essential. Id.

Precedent in the Third Circuit illustrates the difference between what is deemed to be material involvement on the part of a confidential informant and what is not. In United States v. Jiles, 658 F.2d 194, 198 (3d Cir. 1981), a case much different than the one at bar, the court found that 30 or 40 independent witnesses observed an alleged robbery and, therefore, the

testimony of the informant was less critical to the defense, which had access to those witnesses and their testimony. The current case is also distinguishable from a more recent Third Circuit case, United States v. Rivera, 524 F. App'x 821, 827 (3d Cir. 2013), which found that disclosure of an informant's identity was not required in a case where the informants' roles were limited to validating a search rather than the substance of the crimes charged. Finally, in United States v. Johnson, 302 F.3d 139, 149 (3d Cir. 2002), the court declined to compel disclosure where the "informant's only involvement in this case was that he or she introduced the undercover officer to [the defendant]. . .The informant was not present while [the defendant] and the officer drove around looking to buy crack or during the transaction." In each of these cases, unlike the matter at hand, the involvement of the confidential informant was marginal.

The facts of the within case, rather, are more akin to those presented in Rovario, itself. Rovario, like the case before the Court, dealt with the distribution and sale of CDS to a confidential informant identified as "John Doe". Supra, 253 U.S. at 62. The Court there held that the charge was "so closely related to John Doe as to make his identity and testimony highly material." Id. The reasoning of the Court in this precedential case is directly applicable here:

6

> The circumstances of this case demonstrate that John
> Doe's possible testimony was highly relevant and
> might have been helpful to the defense. So far as
> petitioner knew, he and John Doe were alone and
> unobserved during the crucial occurrence for which he
> was indicted. Unless petitioner waived his
> constitutional right not to take the stand in his own
> defense, John Doe was his one material witness.
> Petitioner's opportunity to cross-examine Police Officer
> Bryson and Federal Narcotics Agent Durham was hardly a
> substitute for an opportunity to examine the man who had
> been nearest to him and took part in the transaction.
> Doe had helped to set up the criminal occurrence and had
> played a prominent part in it. His testimony might have
> disclosed an entrapment. He might have thrown doubt upon
> petitioner's identity or on the identity of the package.
> He was the only witness who might have testified to
> petitioner's possible lack of knowledge of the contents
> of the package that he 'transported' from the tree to
> John Doe's car. The desirability of calling John Doe as
> a witness, or at least interviewing him in preparation
> for trial, was a matter for the accused rather than the
> Government to decide.

Id. at 62-63.

With regard to the assault and weapons charges, the need for

disclosure of the Government witness is also essential to his

defense. Again, the Supreme Court's rationale in Rovario is

directly on point:

> Finally, the Government's use against petitioner of his
> conversation with John Doe while riding in Doe's car
> particularly emphasizes the unfairness of
> the nondisclosure in this case. The only person, other
> than petitioner himself, who could controvert, explain
> or amplify Bryson's report of this important
> conversation was John Doe. Contradiction or
> amplification might have borne upon petitioner's
> knowledge of the contents of the package or might have
> tended to show an entrapment.

Id. at 63. It was held to be error in Rovario to permit the Government to withhold the identity of the informant and it would be erroneous to hold the same here.

Thus, a defendant can tip the balance in this weighing process in his favor by showing that the informant played an active role in the criminal activity and that the informant's testimony would sufficiently aid in establishing an asserted defense. United States v. McDonald, 935 F.2d 1212, 1217 (11th Cir. 1991); United States v. Gutierrez, supra 931 F.2d at 1491. Additionally, if as here, the informants are actual participants in the illegal activity, it is presumed that the defendant has met his burden of showing the need to have access to them and there is a duty by the government to reveal their identity. United States v. Tenorio-Angel, supra; United States v. Gutierrez, supra.

When an informant actually participated in the criminal activity the government must "set forth with particularity its reasons for non-disclosure of the informant's whereabouts." United States v. Aguirre-Aguirre, 716 F.2d 293 at 300 (5th Cir. 1983) cited with approval in United States v Tenorio-Angel, supra, 756 F.2d at 1510-11. It is well-accepted that the more active the informant's participation in the criminal activity the greater the need by a defendant for identification of that person. United States v. Gonzalez, 606 F.2d 70 (5th Cir. 1979); Suarez v. United States, 582 F2d 1007 (5th Cir. 1978).

8

Nicholas Buccarielli is clearly entitled to disclosure of and access to the confidential informants in this case since each of them was actually and actively involved in the alleged criminal activities with which he now stands accused. The controlled buys allegedly took place in a private and secure location and the CHS is the only witness with first-hand knowledge of the Defendant's alleged involvement. As is likewise the case with regard to the alleged assault on August 19, 2020, which is claimed to have taken place inside of a private and secure clubhouse and the defense is in possession of evidence to indicate that "Victim 1" was not truthful in his report to law enforcement following the incident. The within case is a far cry from those in which an informant only played an introductory or a cursory role in the investigation. To the contrary, the Government's case against the Defendant is highly dependent upon the informants and their testimony in the case before the Court.

The undisclosed individuals here, furthermore, did much more than simply provide a tip to law enforcement or introduce undercover agents to the Defendant, who then conducted independent controlled purchases or activities. Each of the confidential informants in this case provide the great weight of the evidence against Nicholas Bucciarelli. Without access to said individuals, Defendant has zero capability or means to test the credibility of those material witnesses. Defendant's need for

disclosure, therefore, is great and the information is essential to his defense.

Based on the foregoing, the Defendant respectfully requests that the Court grant his motion for access to and disclosure of the identities of the informants and the surveillance locations of law enforcement during the alleged interactions between Defendant and those individuals.

### CONCLUSION

For the foregoing reasons, it is respectfully requested that the Court order that the identities of the Confidential Human Source and Victim 1 be revealed to the defense, along with all surveillance locations occupied by law enforcement at the time of the alleged interactions between the informants and Defendant.

Respectfully submitted,

Robert N. Agre, Esquire
Attorney for Defendant,
Nicholas Bucciarelli

Dated: 9/22/21

# EXHIBIT A

2019R00556/SCF

**RECEIVED**

**By KimberlyDarling at 1:51 pm, Jun 28, 2021**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. |
| | : | |
| v. | : | Crim. No. 21- 506 (NLH) |
| | : | |
| NICHOLAS BUCCIARELLI, | : | 21 U.S.C. §§ 841(a)(1), (b)(1)(B) |
| a/k/a "Booch" | : | 18 U.S.C. § 2 |

## I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges:

### Count One
(Distribution of, and Possession with Intent to Distribute, Methamphetamine)

On or about June 14, 2019, in Camden County, in the District of New Jersey and elsewhere, the defendant,

**NICHOLAS BUCCIARELLI,**
**a/k/a "Booch,"**

did knowingly and intentionally distribute, and possess with the intent to distribute, 5 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B), and Title 18, United States Code, Section 2.

2019R00556/SCF

### Count Two
(Distribution of, and Possession with Intent to Distribute, Methamphetamine)

On or about June 17, 2019, in Camden County, in the District of New

Jersey and elsewhere, the defendant,

**NICHOLAS BUCCIARELLI,**
**a/k/a "Booch,"**

did knowingly and intentionally distribute, and possess with the intent to

distribute, 5 grams or more of methamphetamine, its salts, isomers, and salts

of its isomers, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and

(b)(1)(B), and Title 18, United States Code, Section 2.

2019R00556/SCF

## Count Three
(Distribution of, and Possession with Intent to Distribute, Methamphetamine)

On or about July 2, 2019, in Camden County, in the District of New Jersey and elsewhere, the defendant,

**NICHOLAS BUCCIARELLI,
a/k/a "Booch,"**

did knowingly and intentionally distribute, and possess with the intent to distribute, 5 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B), and Title 18, United States Code, Section 2.

2019R00556/SCF

## Count Four
(Distribution of, and Possession with Intent to Distribute, Methamphetamine)

On or about July 24, 2019, in Camden County, in the District of New Jersey and elsewhere, the defendant,

### NICHOLAS BUCCIARELLI,
### a/k/a "Booch,"

did knowingly and intentionally distribute, and possess with the intent to distribute, 5 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B), and Title 18, United States Code, Section 2.

2019R00556/SCF

## Count Five
(Distribution of, and Possession with Intent to Distribute, Methamphetamine)

On or about August 1, 2019, in Camden County, in the District of New Jersey and elsewhere, the defendant,

**NICHOLAS BUCCIARELLI,**
**a/k/a "Booch,"**

did knowingly and intentionally distribute, and possess with the intent to distribute, 5 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B), and Title 18, United States Code, Section 2.

2019R00556/SCF

### FORFEITURE ALLEGATION

1.      As a result of committing the controlled substance offenses in

violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), charged in Counts One through

Five of this Indictment, the defendant,

### NICHOLAS BUCCIARELLI,
### a/k/a "Booch,"

shall forfeit to the United States any and all property constituting or derived

from any proceeds the defendant obtained directly or indirectly as a result of

violating Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), and

any property used or intended to be used in any manner or part to commit and

to facilitate the commission of the offenses alleged in this Indictment.

### Substitute Assets Provision

2.      If any of the property described above, as a result of any act or

omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third

party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be

divided without difficulty,

2019R00556/SCF

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as

incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of

the defendant up to the value of the above forfeitable property.

A TRUE BILL

FOREPERSON

RACHAEL A. HONIG
Acting United States Attorney

CASE NUMBER: 21-506

# United States District Court
## District of New Jersey

UNITED STATES OF AMERICA

v.

NICHOLAS BUCCIARELLI,
a/k/a "Booch"

# INDICTMENT FOR

21 U.S.C. §§ 841(a)(1), (b)(1)(B)
18 U.S.C. § 2

A True Bill,

_____
Foreperson

RACHAEL A. HONIG
*ACTING UNITED STATES ATTORNEY*
*FOR THE DISTRICT OF NEW JERSEY*

ROBERT FRAZER
SAMANTHA C. FASANELLO
*ASSISTANT U.S. ATTORNEYS*
*NEWARK, NJ*
*973-297-4388*

# EXHIBIT B

RECEIVED
By KimberlyDarling at 1:52 pm, Jun 28, 2021

2021R00632/RF

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. |
| | : | |
| v. | : | Crim. No. 21- 507 (NLH) |
| | : | |
| NICHOLAS BUCCIARELLI, | : | 18 U.S.C. § 1959(a)(3) |
| a/k/a "Booch" | : | 18 U.S.C. § 924(c)(1)(A)(ii) |
| | : | 18 U.S.C. § 922(g)(1) |
| | : | 18 U.S.C. § 2 |

**I N D I C T M E N T**

The Grand Jury in and for the District of New Jersey, sitting at Newark,

charges:

**COUNT ONE**
(Violent Crime in Aid of Racketeering—Assault with Dangerous Weapons)

**The Racketeering Enterprise**

1.     At all times relevant to this Indictment, NICHOLAS BUCCIARELLI,

a/k/a "Booch," and others known and unknown were members of the Pagan's

Motorcycle Club (the "Pagans" or the "Enterprise"). Specifically, BUCCIARELLI

served as the Sergeant at Arms for the Pagans' Camden County membership

chapter.

2.     The Pagan's Motorcycle Club has been classified as an outlaw

motorcycle gang by multiple law enforcement agencies. The Department of

Justice has designated multiple outlaw motorcycle gangs, including the

Pagans, as violent gangs. Members of the Pagans are known to engage in

criminal activities such as violent crimes, weapons trafficking, and drug

trafficking. The Pagans maintain established membership chapters in

2021R00632/RF

numerous U.S. States and territories, including multiple active chapters in New Jersey.

3.    The organization was established in the late 1950s and continues to employ a hierarchal rank structure and formal by-laws.  Each chapter has its own organizational structure.  Each is managed by a President, a Vice President, a Sergeant at Arms, and a Secretary/Treasurer.  On a national level, the Pagans report to a leadership council that is generally comprised of former chapter leaders known as the "Mother Club."  The Pagans also appoint a national President, Vice President, Sergeant at Arms, and Secretary/Treasurer, all of whom are part of the Mother Club.

4.    Members of the Pagans generally take orders only from their membership chapter's leadership figures, who in turn report to and take orders from the Mother Club.  If a member of one chapter has a grievance against a member of another chapter, he is forbidden to act on it unless he has obtained permission from the leadership of the other chapter.

5.    The Pagans, including their leaders, members and associates, constituted an enterprise as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact, which was engaged in, and the actions of which affected, interstate commerce.  The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

2021R00632/RF

6.     At all times relevant to this Indictment, the Pagans, through their respective leaders, members, and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1)— namely, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance punishable under the laws of the United States, in violation of Title 21, United States Code, Section 846 (conspiracy to distribute and possess with intent to distribute controlled substances), Section 841 (distribution and possession with intent to distribute controlled substances), and Section 843(b) (use of a communication facility to violate the Controlled Substances Act).

### Purposes of the Enterprise

7.     The purposes of the Enterprise included, but were not limited to, the following:

a.     Enriching the members and associates of the Enterprise through criminal activity, including drug trafficking;

b.     Promoting and enhancing the prestige, reputation, and position of the Enterprise with respect to rival criminal organizations;

c.     Preserving and protecting the power, reputation, territory, and criminal ventures of the Enterprise through the use of acts that involved intimidation, threats of violence, and acts of violence, including assault against, among others, members of rival organizations and members of the Pagans who violated the rules of the Enterprise;

Case 1:21-cr-00507-NLH   Document 50   Filed 06/29/21   Page 4 of 10 PageID: 135

2021R00632/RF

   d. Keeping victims and rivals in fear of the Enterprise and its

members and associates; and

   e. Concealing the activities of the Enterprise from law

enforcement.

**The Assault**

  8. On or about August 19, 2020, in Gloucester County, in the District

of New Jersey and elsewhere, the defendant,

**NICHOLAS BUCCIARELLI,**
**a/k/a "Booch,"**

for the purpose of gaining entrance to, and maintaining and increasing position

in, the Pagan's Motorcycle Club, an enterprise engaged in racketeering activity,

did knowingly and purposely assault Victim-1 with dangerous weapons,

specifically a firearm and an axe handle, contrary to N.J.S.A. 2C:12-1(b)(2).

  In violation of Title 18, United States Code, Section 1959(a)(3).

Case 1:21-cr-00507-NLH   Document 50-1   Filed 06/29/21   Page 5 of 10 PageID: 136

2021R00532/RF

### **COUNT TWO**
(Brandishing of a Firearm During a Crime of Violence)

On or about August 19, 2020, in Gloucester County, in the District of New

Jersey and elsewhere, the defendant,

**NICHOLAS BUCCIARELLI,**
**a/k/a "Booch,"**

during and in relation to a crime of violence for which he may be prosecuted in

a court of the United States—specifically, the assault in aid of racketeering

activity charged in Count One of this Indictment—did knowingly use and carry

a firearm, which was brandished.

In violation of Title 18, United States Code, Section 924(c)(1)(A)(ii).

2021R00632/RF

## COUNT THREE
(Possession of Firearms by a Convicted Felon)

In or around June and July 2020, in Camden County, in the District of New Jersey and elsewhere, the defendant,

## NICHOLAS BUCCIARELLI,
## a/k/a "Booch,"

knowing that he had previously been convicted of at least one crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting interstate commerce four (4) firearms—namely one Ruger Red Hawk, .44 Magnum revolver, bearing serial number 501-18340; one Savage Arms, 69RXL, 12 Gauge "Weapon made from a shotgun," bearing serial number E244699; one Sig Sauer P320 .45 caliber pistol with no serial number present; and one Ruger Mark II Target .22 caliber pistol, bearing serial number 221-48377.

In violation of Title 18, United States Code, Section 922(g)(1) and Title 18, United States Code, Section 2.

2021R00632/RF

## COUNT FOUR
(Possession of a Firearm by a Convicted Felon)

On or about September 1, 2020, in Camden County, in the District of New Jersey and elsewhere, the defendant,

### NICHOLAS BUCCIARELLI,
### a/k/a "Booch,"

knowing that he had previously been convicted of at least one crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting interstate commerce a firearm, namely one Kimber Micro 9 Raptor 9 millimeter handgun, bearing serial number PB0262318.

In violation of Title 18, United States Code, Section 922(g)(1).

2021R00632/RF

## FORFEITURE ALLEGATION

1.      As a result of committing the firearms offenses in violation of 18
U.S.C. § 922(g)(1) and 18 U.S.C. § 924(c)(1)(A)(i), charged in Counts Two, Three,
and Four of this Indictment, the defendant,

**NICHOLAS BUCCIARELLI,**
**a/k/a "Booch,"**

shall forfeit to the United States, pursuant to 18 U.S.C. § 924(d) and 28 U.S.C.
§ 2461(c), any firearms and ammunition involved in or used in the commission
of such offenses, including:  one Ruger Red Hawk, .44 Magnum revolver,
bearing serial number 501-18340; one Savage Arms, 69RXL, 12 Gauge
"Weapon made from a shotgun," bearing serial number E244699; one Sig
Sauer P320 .45 caliber pistol with no serial number present; one Ruger Mark II
Target .22 caliber pistol, bearing serial number 221-48377; and one Kimber
Micro 9 Raptor 9 millimeter handgun, bearing serial number PB0262318.

## Substitute Assets Provision

2.      If any of the property described above, as a result of any act or
omission of the defendant:

  a.      cannot be located upon the exercise of due diligence;

  b.      has been transferred or sold to, or deposited with, a third
          party;

  c.      has been placed beyond the jurisdiction of the court;

  d.      has been substantially diminished in value; or

  e.      has been commingled with other property which cannot be

2021R00632/RF

divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as

incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of

the defendant up to the value of the above forfeitable property.

A TRUE BILL

FOREPERSON

RACHAEL A. HONIG
Acting United States Attorney

**CASE NUMBER: 21-707**

# United States District Court
## District of New Jersey

### UNITED STATES OF AMERICA

### v.

### NICHOLAS BUCCIARELLI,
### a/k/a "Booch"

# INDICTMENT FOR

**18 U.S.C. § 1959(a)(3)**
**18 U.S.C. § 924(c)(1)(A)(ii)**
**18 U.S.C. § 922(g)(1)**
**18 U.S.C. § 2**

A True Bill,

_____
Foreperson

**RACHAEL A. HONIG**
*ACTING UNITED STATES ATTORNEY*
*FOR THE DISTRICT OF NEW JERSEY*

ROBERT FRAZER
SAMANTHA C. FASANELLO
ASSISTANT U.S. ATTORNEYS
NEWARK, NJ
973-297-4388

# EXHIBIT C

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
|---|---|---|

| **HEADER** |
|---|

| **Source ID:** | S-00094489 |
|---|---|
| **Date:** | 07/24/2019 |
| **Case Agent Name:** | FBINET\mwbailey |
| **Field Office/Division:** | Philadelphia |
| **Squad:** | SJR1 (VCMO) |

| **SOURCE REPORTING** |
|---|

**Date of Contact:**     07/24/2019

**List all present including yourself (do not include the CHS):**
SA Michael Bailey, TFO Sheldon Bryant, TFO Andrew Coulter, TFO Jose Gonzalez, and TFO Mike McFetridge

**Type of Contact:**     In Person

| **Country:** | UNITED STATES |
|---|---|
| **City:** | Brooklawn |
| **State:** | New Jersey |

**Date of Report:**     07/24/2019

| **Substantive Case File Number** |
|---|
| 281P-PH-3109900 |

**UNCLASSIFIED**

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION<br>CHS REPORTING DOCUMENT |  |
|---|---|---|

**Check here if additional reporting is in Echo**
No

**Source Reporting:**

On July 24, 2019, a Confidentia lHuman Source (CHS), who is in a position to testify, was contacted by Federal Bureau of Investigation (FBI) Task Force Officer (TFO) Sheldon Bryant and Special Agent Michael Bailey concerning the purchase of one ounce of methamphetamine from NICHOLAS BUCCIARELLI. Also present for the operation were TFO's Jose Gonzalez, Andrew Coulter, and Mike McFetridge. CHS, who was previously known to the Agent and Officers voluntarily provided the following information:

All times are approximates:

10:20 AM - CHS met with law enforcement at a predetermined location. Upon arrival, CHS was physically searched by TFO Bryant which identified no contraband. CHS was provided with information regarding the planned controlled drug purchase.

10:27 AM - CHS placed a recorded phone call to NICHOLAS BUCCIARELLI (856-669-7321) in the presence of TFO Bryant and SA Bailey. CHS stated he was on his way to NICHOLAS BUCCIARELLI's residence and NICHOLAS BUCCIARELLI stated he would be waiting for him.

10:39 AM - SA Bailey provided CHS with a FBI recording device and $800.00 of U.S.C for the purchase of one (1)ounce of methamphetamine from NICHOLAS BUCCIARELLI. CHS was transported by TFO Bryant and SA Bailey to an area near NICHOLAS BUCCIARELLI's residence of208 New Jersey Rd Brooklawn, NJ 08030.

10:44 AM - After being followed by law enforcement, TFO Coulter observed CHS arrive at the rear of BUCCIARELLI's residence located at 208 New Jersey Road, Brooklawn, NJ. Physical surveillance was maintained by SA Bailey, TFO Bryant, TFO Coulter, TFO Gonzalez and TFO McFetridge.

Once the CHS arrived at the residence, the CHS could be heard over the recording device, which also serves as a transmitter. After approximately eight minutes, the CHS departed the residence and was picked up by SA Bailey and TFO Bryant.

10:57 AM SA Bailey deactivated the recorder and the CHS provided a plastic heat sealed bag containing suspected crystal methamphetamine to SA Bailey. TFO Bryant then searched the CHS again for money and contraband with negative results. The CHS then explained that he/she went to BUCCIARELLI's residence. During the visit, BUCCIARELLI retrieved the suspected crystal methamphetamine from inside the residence and gave it tothe CHS in exchange for the US Currency provided to the CHS by SA Bailey. The suspected crystal methamphetamine was subsequently field tested and tested positive for methamphetamine. SA Bailey and TFO Bryant then packed and forwarded the methamphetamine to DEA laboratory via FedEx.

For the exact nature of the conversation, a review of the recording should be made.

Synopsis:

The CHS purchased crystal methamphetamine from Nicholas Bucciarelli.


**Synopsis:**
The CHS purchased crystal methamphetamine from Nicholas Bucciarelli.

| SIGNATURE | | |
|---|---|---|
| Submitted By | sabryant2 (undefined undefined) | Wed, 31 Jul 2019 08:37:33 -0400 |
| First Level Approved By | VDROSELLI (Vito Roselli) | Wed, 31 Jul 2019 08:54:15 -0400 |

| FD-1023 | Page 2 of 2 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA    :   **CRIMINAL COMPLAINT**

               v.            :

                            :   Hon. James B. Clark, III

NICHOLAS BUCCIARELLI,    :

   a/k/a "Booch,"          :   Mag. No. 20-12328

ANTHONY D'ALESSANDRO,   :

   a/k/a "Fugit,"          :

NICHOLAS MARINO,        :

   a/k/a "Lefty" and       :

MICHAEL DORAZO,         :

   a/k/a "Cage"           :

I, Anthony Santorelli, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and that this complaint is based on the following facts:

### SEE ATTACHMENT B

_____

Anthony Santorelli
ATF Special Agent

Special Agent Anthony Santorelli attested to this Complaint by telephone pursuant to Federal Rule of Criminal Procedure 4.1(b)(2)(A) on August 31, 2020, in the District of New Jersey

Honorable James B. Clark, III
United States Magistrate Judge

_____

Signature of Judicial Officer

## ATTACHMENT A

### COUNT ONE
(Violent Crime in Aid of Racketeering – Assault
with a Dangerous Weapon)

On or about August 19, 2020, in Gloucester County, in the District of New Jersey and elsewhere, the defendants,

**NICHOLAS BUCCIARELLI,**
**a/k/a "Booch,"**
**ANTHONY D'ALESSANDRO,**
**a/k/a "Fugit," and**
**NICHOLAS MARINO,**
**a/k/a "Lefty,"**

for the purpose of maintaining and increasing position in the Pagans Motorcycle Club, an enterprise engaged in racketeering activity, did knowingly and purposely assault Victim-1 with dangerous weapons, specifically, an axe handle and a firearm, contrary to N.J.S.A. 2C:12-1(b) and 2C:2-6, and did aid and abet the same.

In violation of Title 18, United States Code, Section 1959(a)(3), and Title 18, United States Code, Section 2.

## COUNT TWO
(Brandishing of a Firearm During a Crime of Violence)

On or about August 19, 2020, in Gloucester County, in the District of New Jersey and elsewhere, the defendants,

**NICHOLAS BUCCIARELLI,
a/k/a "Booch,"
ANTHONY D'ALESSANDRO,
a/k/a "Fugit," and
NICHOLAS MARINO,
a/k/a "Lefty,"**

during and in relation to a crime of violence for which each may be prosecuted in a court of the United States—specifically, the assault in aid of racketeering activity charged in Count One of this Complaint—did knowingly use and carry a firearm, which was brandished, and did aid and abet the same.

In violation of Title 18, United States Code, Section 924(c)(1)(A)(ii), and Title 18, United States Code, Section 2.

**COUNT THREE**
(Possession of a Firearm by a Convicted Felon)

In or around June 2020, in Camden County, in the District of New Jersey and elsewhere, the defendants,

**NICHOLAS BUCCIARELLI,**
**a/k/a "Booch," and**
**MICHAEL DORAZO,**
**a/k/a "Cage,"**

each knowing that he had previously been convicted of at least one crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting interstate commerce four (4) firearms—namely one Ruger Red Hawk, .44 Magnum revolver, bearing serial number 501-18340; one Savage Arms, 69RXL, 12 Gauge "Weapon made from a shotgun," bearing serial number E244699; one Sig Sauer P320 .45 caliber pistol with no serial number present; and one Ruger, Mark II Target, .22 caliber pistol, bearing serial number 221-48377.

In violation of Title 18, United States Code, Section 922(g)(1).

## **ATTACHMENT B**

I, Anthony Santorelli, am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives.  I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, videos, photographs, and other items of evidence.  The information set forth herein contains information obtained from investigators and other law enforcement officers who have interviewed numerous witnesses and sources.  Where statements of others are related herein, they are related in substance and part.  Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation.  Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### **The Enterprise**

1. At all times relevant to this Complaint, defendants NICHOLAS BUCCIARELLI, a/k/a "Booch," ANTHONY D'ALESSANDRO, a/k/a "Fugit," JAMES MARINO,  a/k/a "Lefty," MICHAEL DORAZO, a/k/a "Cage" and others known and unknown, were members of the Pagan's Motorcycle Club (the "Pagans" or the "Enterprise").

2. The Pagan's Motorcycle Club has been classified as an outlaw motorcycle gang by multiple law enforcement agencies.  The Department of Justice has designated multiple outlaw motorcycle gangs, including the Pagans, as violent gangs.  Members of the Pagans are known to engage in criminal activities such as violent crimes, weapons trafficking, and drug trafficking.  The Pagans is an organization that maintains established membership chapters in numerous U.S. States and territories, including multiple active chapters in New Jersey.

3. The organization was established in the late 1950s, and continues to employ a hierarchal rank structure and formal by-laws.  Each chapter has its own organizational structure.  Each is managed by a President, a Vice President, a Sergeant at Arms, and a Secretary/Treasurer.  On a national level, the Pagans report to a leadership council that is generally comprised of thirteen former chapter presidents known as the "Mother Club."  The Pagans also appoint a national President, Vice President, Sergeant at Arms, and Secretary/Treasurer, all of whom are part of the Mother Club.

4. Members of the Pagans generally take orders only from their membership chapter's leadership figures, who in turn report to and take orders from the Mother Club.  If a member of one chapter has a grievance against a member of another chapter, he is forbidden to act on it unless he has obtained permission from the leadership of the other chapter.

5. The Pagans, including its leaders, members and associates, constituted an enterprise as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact, which was engaged in, and the actions affected, interstate commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

6. At all times relevant to this Complaint, the Pagans, through its respective leaders, members, and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1)— namely, offenses involving the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance punishable under the laws of the United States, in violation of Title 21, United States Code, Section 846 (conspiracy to distribute and possess with intent to distribute controlled substances), Section 841 (distribution and possession with intent to distribute controlled substances), and Section 843(b) (use of a communication facility to violate the Controlled Substances Act).

### Purposes of the Enterprise

7. The purposes of the Enterprise included, but were not limited to, the following:

    a. Enriching the members and associates of the Enterprise through criminal activity, including drug trafficking;

    b. Promoting and enhancing the prestige, reputation, and position of the Enterprise with respect to rival criminal organizations;

    c. Preserving and protecting the power, reputation, territory, and criminal ventures of the Enterprise through the use of acts that involved intimidation, threats of violence, and acts of violence, including assault against, among others, members of rival organizations and members of the Pagans who violated the rules of the Enterprise;

    d. Keeping victims and rivals in fear of the Enterprise and its members and associates; and

    e. Concealing the activities of the Enterprise from law enforcement.

## Membership in the Enterprise

8. Defendant Nicholas BUCCIARELLI, a/k/a "Booch," is the Sergeant at Arms for the Camden County Chapter of the Pagans (the "Camden County Pagans") and a supplier of methamphetamine.

9. Defendant ANTHONY D'ALESSANDRO, a/k/a "Fugit," is the Sergeant at Arms for the Gloucester County Chapter of the Pagans (the "Gloucester County Pagans").

10.   Defendant NICHOLAS MARINO, a/k/a "Lefty," is the President of the Gloucester County Pagans.

11.   Defendant MICHAEL DORAZO, a/k/a "Cage," is a member of the Camden County Pagans and a supplier of methamphetamine.

## Means and Methods of the Enterprise

12.   Among the means and methods by which the defendants and other members and associates of the Pagans conducted and participated in the conduct of the affairs of the Enterprise were the following:

  a. Members of the Pagans and their associates committed, attempted, and threatened to commit acts of violence, including assaults, to protect and expand the Enterprise's criminal operations;

  b. Participation in criminal activity by a member, particularly violent acts directed at rivals or as directed by the Pagans' leadership, increased the respect accorded to that member, and resulted in that member's maintaining and increasing status in the Enterprise;

  c. Members of the Pagans and their associates used and threatened to use physical violence against various individuals, including members of rival organizations;

  d. Members of the Enterprise and their associates trafficked methamphetamine and other controlled substances as a means of enriching themselves.

## The Seizure of Firearms Belonging to the Pagans

13.   On or about July 23, 2020, an associate of the Gloucester County Pagans ("Victim-1") contacted law enforcement. Victim-1 stated that DORAZO had given Victim-1 six firearms and a large amount of ammunition over the

course of the preceding several weeks. DORAZO asked Victim-1 to store the firearms in his garage.

14.   After speaking with Victim-1 on July 23, 2020, law enforcement drove to Victim-1's house, and Victim-1 permitted law enforcement to enter his garage and seize six firearms and ammunition. Specifically, law enforcement seized the following: One AR-15 style Privately Made Firearm ("PMF") with no serial number present; one Ruger Red Hawk, .44 Magnum revolver, bearing serial number 501-18340; one Savage Arms, 69RXL, 12 Gauge "Weapon made from a shotgun" bearing serial number E244699; one Sig-Sauer P320 .45 caliber pistol with no serial number present; one Ruger, Mark II Target, .22 caliber pistol bearing serial number 221-48377; and one Pen Gun with no serial number present (collectively, the "Pagans' Firearms"); and one thousand seven hundred and eighty-four (1,784) rounds of assorted caliber ammunition (the "Ammunition"). At least four of the Pagans' Firearms were manufactured outside the State of New Jersey.[1]

15.   Later that evening, at the direction of law enforcement, Victim-1 called DORAZO. During that call, Victim-1 told DORAZO that he sold the Pagans' Firearms for five thousand dollars ($5,000). DORAZO asked Victim-1 if Victim-1 had the proceeds from the purported firearms transaction, and advised Victim-1 that Victim-1 had to make things right. DORAZO then directed Victim-1 to meet DORAZO at a location in Pennsylvania to pay DORAZO for the firearms transaction. Law enforcement then provided Victim-1 with a recording device and $5,000 in pre-recorded U.S. currency. Victim-1 then travelled to the meeting location, followed by law enforcement. As Victim-1 was driving, DORAZO called Victim-1 and changed the meeting location to another location in Pennsylvania. Shortly after arriving at the new meeting location, law enforcement observed DORAZO drive into the parking lot, get out of his vehicle and meet with Victim-1. According to Victim-1, he provided DORAZO the $5,000 in pre-marked currency during this meeting. DORAZO then got back into his vehicle and drove away.

16.   On or about July 29, 2020, Victim-1 called law enforcement and stated that DORAZO had just arrived at Victim-1's residence unannounced. Victim-1 then used his cell phone's speaker phone function to allow law enforcement to surreptitiously monitor his interaction with DORAZO. DORAZO advised Victim-1 that the Pagans were angry when they learned that Victim-1 sold the Pagans' Firearms, and that Victim-1 had to pay the Pagans an additional $7,000.

17.   DORAZO then told Victim-1 to call the person to whom he sold the Pagans' Firearms. Victim-1 then called an ATF Special Agent acting in an

---

[1] The ATF has not yet been able to determine the place of manufacture for the PMF or the Pen Gun.

undercover capacity ("UC-1"). UC-1 then spoke with DORAZO over the telephone. During that call, UC-1 told DORAZO that he had already sold the Pagans' Firearms and that there was no way to get them back. DORAZO and UC-1 then discussed the possibility of obtaining new firearms to replace the Pagans' Firearms. Victim-1 ultimately provided DORAZO with $4,000. DORAZO then left Victim-1's residence and drove away.

18.     Victim-1 stated that DORAZO also gave him a one-gram sample of methamphetamine, which Victim-1 supplied to law enforcement. According to Victim-1, DORAZO deals methamphetamine for the Pagans, specifically, for BUCCIARELLI. Another confidential source has also informed law enforcement that both DORAZO and BUCCIARELLI distribute methamphetamine in and around Camden and Gloucester Counties.

## August 19, 2020 Retaliation

19.     On or about August 19, 2020, D'ALESSANDRO called Victim-1 and stated that MARINO wanted to meet with Victim-1 the Clubhouse for the Gloucester County Pagans (the "Gloucester Pagans Clubhouse"), at 8:00 p.m. that evening. The Gloucester Pagans Clubhouse is a building located on the same property as D'ALESSANDRO's home.

20.     That evening, Victim-1 drove to the Gloucester Pagans Clubhouse. Outside, he met MARINO and D'ALESSANDRO. D'ALESSANDRO told Victim-1 to leave his cell phone outside, and then used a handheld electronics detector on Victim-1 to ensure that he did not have any electronic devices. The three then went inside the Gloucester Pagans Clubhouse.

21.     A short time later, BUCCIARELLI entered the Gloucester Pagans Clubhouse carrying an axe handle. He struck Victim-1 with the axe handle, leaving visible bruising on Victim-1's shoulder. BUCCIARELLI then drew a handgun from his waistband, racked the slide and pointed it at Victim-1's head. BUCCIARELLI then told Victim-1 that he was going to kill him, and yelled "Where are my f***ing guns? Where are my f***ing guns?"

22.     Victim-1 then told BUCCIARELLI that he sold the firearms and gave the proceeds to DORAZO. BUCCIARELLI then told Victim-1 that he wanted to speak to the person who bought the firearms. BUCCIARELLI then left the Pagans Clubhouse to retrieve Victim-1's cell phone. While BUCCIARELLI was outside, D'ALESSANDRO and MARINO told Victim-1 that he was not permitted to leave the Gloucester Pagans Clubhouse until the issue was resolved.

23.     BUCCIARELLI then returned with Victim-1's cell phone. BUCCIARELLI then told Victim-1 to call the person who purportedly bought the firearms. BUCCIARELLI specifically instructed Victim-1 that Victim-1 was only permitted to say what BUCCIARELLI instructed Victim-1 to say to the

purported buyer. BUCCIARELLI specified that if Victim-1 varied from the script or used any "code words" BUCCIARELLI would kill Victim-1.

24.    Victim-1 then called UC-1. During that conversation, Victim-1 asked UC-1 details about the purported firearms transaction. UC-1, understanding that he was on speaker and that members of the Enterprise might be listening to their conversation, remained in his undercover persona throughout the conversation.

25.    After concluding the call, BUCCIARELLI continued to interrogate Victim-1. BUCCIARELLI stated that Victim-1's version of the events differed from what BUCCIARELLI heard from DORAZO. BUCCIARELLI, MARINO, and D'ALESSANDRO ultimately permitted Victim-1 to leave the Gloucester Pagans Clubhouse. However, BUCCIARELLI told Victim-1 that they would discuss the unauthorized "sale" of the Pagan's Firearms again in a couple of days.

26.    A review of BUCCIARELLI's criminal history reveals that prior to June 2020, he had been convicted of at least one crime punishable by imprisonment for a term exceeding one year. Specifically, on May 3, 1996, he was convicted of Criminal Restraint, in violation of N.J.S.A. 2C:13-23A, and of Manufacture/Distribution of a Controlled Substance, in violation of N.J.S.A. 2C:35-5(b).

27.    A review of DORAZO's criminal history reveals that prior to June 2020, he had been convicted of at least one crime punishable by imprisonment for a term exceeding one year. Specifically, on March 23, 2016, he was convicted of Burglary, in violation of N.J.S.A. 2C:18-2A and on April 20, 2016 he was convicted of Possession of a Controlled Substance with Intent to Distribute, in violation of N.J.S.A. 2C:35-7.